UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNARD GAY, | ) | 4:16CV0643 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE JEFFREY HELMICK |
| v. | ) | (Mag. Judge David A. Ruiz) |
| | ) | |
| CHRISTOPHER LaROSE, | ) | |
| Warden, | ) | |
| | ) | |
| Respondent | ) | REPORT AND |
| | ) | <u>RECOMMENDATION</u> |

RUIZ, MAG. JUDGE

The petitioner Kennard S. Gay ("Gay," or "petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition is before the magistrate judge pursuant to Local Rule 72.2(b)(2). The petitioner is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case of *State of Ohio v. Gay*, Case No. CR 11-09-2625 (Summit County May 17, 2012). (R. 6, RX 4, PageID #: 65-66.)

Gay has filed a petition through counsel for a writ of habeas corpus, arising out of his 2012 conviction for murder, with a firearm specification, and having a firearm while under disability, in the Summit County (Ohio) Court of Common Pleas. (R. 1, petition, PageID #: 1-27.) Gay's petition raises two grounds for relief:

1. Petitioner received ineffective assistance of appellate counsel.

2. Petitioner received ineffective assistance of trial counsel.

(R. 1, PageID #: 18, 27.)

The respondent has filed a motion to dismiss, which argues that the petition was untimely filed. (R. 6, PageID #: 46-48.) Gay has filed Traverse, in opposition to the motion. (R. 10, PageID #: 368-385.) For the following reasons, and after a careful analysis of the parties' respective filings, the magistrate judge recommends that the petition be dismissed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The state court of appeals set forth the following factual and procedural background:

> On September 10, 2011, Kennard Gay and Melvin "Ben" Coleman were involved in an argument in front of Kelly's Drive Thru on Copley Road in Akron. The two men did not know each other prior to that day. Earlier in the day, Mr. Coleman came to the home of Mr. Gay's mother, Ramona "Mona" White, and accused her of having his missing dog. During the course of the argument, Mr. Gay shot Mr. Coleman three times from approximately three feet away. He claims he was defending himself and his mother when he shot Mr. Coleman. Mr. Coleman died from internal bleeding due to a gunshot wound to his chest. Mr. Gay fled the scene, but turned himself in to the police six days later.
>
> The Grand Jury indicted Mr. Gay on the following charges: (1) one count of aggravated murder with a firearm specification, (2) one count of murder with a firearm specification, (3) one count of having weapons while under disability, and (4) one count of attempted aggravated murder. In the same indictment, he was also charged with other counts associated with an unrelated incident that occurred on August 18, 2011. Prior to trial, the attempted aggravated murder charge was dismissed, and the charges associated with the August 18th incident

>were bifurcated to be tried separately from the charges related to the September 10th incident.
>
>The case proceeded to trial on the aggravated murder with firearm specification, murder with firearm specification, and having weapons while under disability charges. Mr. Gay asserted that the affirmative defenses of self-defense and defense of others precluded his conviction. He was acquitted of the aggravated murder with firearm specification charge, but convicted of the murder with firearm specification and having weapons while under disability charges. The trial court sentenced him to serve the statutorily mandated prison term of 15 years to life for murder, three years for the firearm specification, and three years for having weapons while under disability. Mr. Gay was ordered to serve all imposed terms of incarceration consecutively.

(R. 6, RX 10, PageID #: 166-167; *State v. Gay*, No. 26487, 2013 WL 5432856, at *1 (Ohio Ct. App. Sept. 25, 2013).)

Gay filed a timely direct appeal, which raised the following four assignments of error:

>1. Kennard Gay was denied a fair trial when the trial court granted the State's motion in limine to exclude evidence that, before September 10, 2011, Melvin Coleman had threatened Gay's mother with a gun, and that Coleman had been jailed in connection with possessing a gun.
>
>2. Gay's murder conviction was against the manifest weight of the evidence, and must be reversed.
>
>3. Gay was denied a fair trial through the presentation of repetitive, gruesome photograph's from Coleman's autopsy.
>
>4. Gay was denied a fair trial due to numerous, cumulative instances of prosecutorial misconduct.

(R. 6, RX 7, PageID #: 78.) The court of appeals affirmed the convictions. (R. 6, RX 10, PageID #: 186; *Gay*, 2013 WL 5432856.)

Gay appealed to the Supreme Court of Ohio, presenting a single proposition of law:

> 1. The Ninth District Court of Appeals failed to properly analyze Kennard's First Assignment of Error, as it applied the standard of review outlined in State v. Grubb (1986), 28 Ohio St.3d 199, but failed to continue their analysis to include the exclusion set forth in State v. Gilmore (1986). 28 Ohio St.3d 190.

(R. 6, RX 12, PageID #: 192.)  The Ohio Supreme Court declined to accept jurisdiction, on January 22, 2014.  (R. 6, RX 14, PageID #: 223; State v. Gay, 137 Ohio St.3d 1477, 2 N.E.3d 270 (2014).)

On October 9, 2013, Gay filed an application for reconsideration in the court of appeals.  (R. 6, RX 15, PageID #: 224-232.)  The court of appeals denied the application as untimely filed.  (R. 6, RX 16, PageID #: 233.)

On June 10, 2015, Gay filed a delayed application to reopen his appeal pursuant to Ohio App.R. 26(B), claiming ineffective assistance of counsel.  (R. 6, RX 17, PageID #: 235-249.)  On August 13, 2015, the state court of appeals denied the application as untimely filed, without a showing of good cause to excuse its untimeliness.  (R. 6, RX 18, PageID #: 250-251.)  Gay appealed this decision to the Supreme Court of Ohio, presenting the following proposition of law:

> 1. An appellate court abuses its discretion by denying a delayed application to reopen an appeal where the record clearly reveals that the appellant received ineffective assistance of appellate counsel, was never advised of the fact that relief was available pursuant to Appellate Rule 26(B), was represented by counsel at all times relevant and was able to show good cause for delay in filing the application.

(R. 6, RX 20, PageID #: 256.)  The Ohio Supreme Court declined to accept jurisdiction on December 2, 2015.  (R. 6, RX 22, PageID #: 272; State v. Gay, 144 Ohio St.3d 1410, 41 N.E.3d 448 (2015).)

Gay then filed this petition for a writ of habeas corpus on May 16, 2016. (R. 1, PageID #: 1-27.)

## II. HABEAS CORPUS REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, which provides the standard of review that federal courts must apply when considering applications for a writ of habeas corpus. Under the AEDPA, federal courts have limited power to issue a writ of habeas corpus with respect to any claim that was adjudicated on the merits by a state court. The Supreme Court, in *Williams v. Taylor*, provided the following guidance:

> Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied -- the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-413 (2002). *See also Lorraine v. Coyle*, 291 F.3d 416, 421-422 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003).

A state court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set

forth in [Supreme Court] cases." *Williams*, 529 U.S. at 405. *See also Price v. Vincent*, 538 U.S. 634, 640 (2003). A state court decision is not unreasonable, however, simply because the federal court considers the state decision to be erroneous or incorrect. Rather, the federal court must determine that the state court decision is an objectively unreasonable application of federal law. *Williams*, 529 U.S. at 410-12; *Lorraine*, 291 F.3d at 422.

### III. STATUTE OF LIMITATIONS

The respondent's motion to dismiss argues that the petition was untimely filed, and should be dismissed. (R. 6, PageID #: 46-48.)

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a state prisoner seeking a federal writ of habeas corpus to file his petition within one year after his state conviction has become final. *Carey v. Saffold*, 536 U.S. 214, 216 (2002) (citing 28 U.S.C. § 2244(d)(1)(A)). The conviction becomes final "by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). In addition, the one-year statute of limitations does not begin to run until all direct criminal appeals in the state system are concluded, followed by either completion or denial of certiorari before the United States Supreme Court, or the expiration of the time allowed (90 days) for filing for

certiorari.[1] *Clay v. United States*, 537 U.S. 522, 528 n.3 (2003); *Anderson v. Litscher*, 281 F.3d 672, 675 (7th Cir. 2002); *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001), *cert. denied*, 534 U.S. 924 (2001) (citing cases).

Gay's conviction became final, for purposes of 28 U.S.C. § 2244(d)(1)(A), when time for direct review of his conviction and sentencing expired.  The Supreme Court of Ohio denied Gay leave to appeal on January 22, 2014.  (R. 6, RX 14, PageID #: 223; *Gay*, 137 Ohio St.3d 1477, 2 N.E.3d 270.)  Gay did not seek certiorari to the United States Supreme Court within the ninety-day period following the state supreme court decision.  Gay's conviction, therefore, became final on April 22, 2014.  The statute of limitations for filing his federal habeas petition expired one year later, April 23, 2015.  Consequently, Gay's petition filed on May 16, 2016, was untimely.  28 U.S.C. § 2244(d)(1)(A).

Gay had filed an application to reopen his appeal, pursuant to Ohio App. Rule 26(B), on June 10, 2015 (R. 6, RX 17, PageID #: 235-249), which the court of appeals found to be barred as untimely (R. 6, RX 18, PageID #: 250-251).  Under Ohio law, a Rule 26(B) motion to reopen must be filed in the court of appeals within 90 days of the appellate judgment.  *State v. Lamar*, 102 Ohio St.3d 467, 468, 812 N.E.2d 970 (2004) (per curiam), *cert. denied*, 543 U.S. 1168 (2005); *State v. Reddick*, 72 Ohio St. 3d 88, 90, 647 N.E.2d 784, 786 (1995) (per curiam).  The appellate judgment at issue was entered on September 25, 2013.  (R. 6, RX 10, PageID #: 166; *Gay*, 2013 WL

---

[1] A habeas petitioner filing for collateral relief does not benefit from the 90 day certiorari period.  *Lawrence v. Florida*, 549 U.S. 327 (2007) (interpreting 28

5432856.) The motion to reopen should have been filed by December 26, 2013. Gay's application to reopen was not filed until June 10, 2015. (R. 6, RX 17, PageID #: 235-249.) Gay's application was thus rejected as untimely. (R. 6, RX 18, PageID #: 250-251.)

Further, Gay's untimely Rule 26(B) application does not affect the limitations period. As a general principle, the limitations period is tolled while properly-filed state post-conviction or collateral proceedings are pending. Souter v. Jones, 395 F.3d 577, 585 (6th Cir. 2005); Searcy v. Carter, 246 F.3d 515, 517-518 (6th Cir.), cert. denied, 534 U.S. 905 (2001); 28 U.S.C. § 2244(d)(2). Although filing a collateral motion may toll the running of a pending, unexpired one-year limitations period, Souter, 395 F.3d at 585, it will not revive the statute, or cause it to begin running anew. Hill v. Randle, No. 00-4168, 2001 WL 1450711, at *2 (6th Cir. Nov. 7, 2001); Searcy, 246 F.3d at 519; Leon v. Bradshaw, No. 1:05CV875, 2006 WL 1624430, at *4 (N.D. Ohio June 6, 2006). Here, Gay's Rule 26(B) motion was filed after the habeas statute of limitations had expired.[2]

The statute of limitations period for Gay to file a petition for habeas expired on April 23, 2015, and Gay's habeas petition was not filed until May 16, 2016. The petition should be denied as untimely filed.

---

U.S.C. § 2244(d)(2)).
 [2] Even if the Rule 26(B) motion had been filed within the habeas statute of limitations period, an untimely post-conviction or collateral motion is not considered properly filed for purposes of tolling the statute of limitations. Allen v. Siebert, 552 U.S. 3 (2007) (per curiam) (affirming Pace v. DiGuglielmo, 544 U.S. 408 (2005));

IV.  EQUITABLE TOLLING

Gay urges the court to apply equitable tolling to save his petition, contending: "The petitioner's claims are not time barred as the petitioner has presented claims and evidence establishing his actual innocence and establishing that a constitutional error occurred." (R. 10, PageID #: 375.)

The Supreme Court has held that the habeas statute of limitations may be subject to equitable tolling in appropriate cases. *Holland v. Florida*, 560 U.S. 631 (2010). Gay, however, bears the burden of persuading the court that he is entitled to equitable tolling. *Connolly v. Howes*, No. 04-2075, 2008 WL 5378012, at *4 (6th Cir. Dec. 23, 2008); *Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002); *Day v. Konteh*, No. 1:08CV0212, 2009 WL 3321388, at *10 (N.D. Ohio Oct. 13, 2009).

The Sixth Circuit, under certain limited and extraordinary circumstances, has allowed for equitable tolling based on actual innocence. *McSwain v. Davis*, No. 06-1920, 2008 WL 2744640, at *7-*9 (6th Cir. July 15, 2008), *cert. denied*, 557 U.S. 919 (2009); *Souter*, 395 F.3d at 597-599; *see also McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013) (tenable actual innocence claims rare). In *Souter*, the petitioner was able to point to new evidence, unavailable at the time of his trial, supporting a credible claim of actual innocence. *See, e.g.*, *Souter*, 395 F.3d at 583-584. The threshold issue was whether the new facts raised sufficient doubt about the

---

*Williams v. Wilson*, No. 03-4404, 2005 WL 2175914, at *3 (6th Cir. Aug. 9, 2005), *cert. denied*, 547 U.S. 1152 (2006).

petitioner's guilt to undermine confidence in his conviction. Id. at 590 (quoting Schlup v. Delo, 513 U.S. 298, 317 (1995).) The Sixth Circuit stated:

> To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." [Schlup, 513 U.S. at 327]. The [Supreme] Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." Schlup, 513 U.S. at 324, 115 S.Ct. 851. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" Id. at 321, 115 S.Ct. 851.

Souter, 395 F.3d at 590; see also McQuiggin, 133 S. Ct. at 1928; Maag v. Konteh, No. 3:05CV1574, 2006 WL 2457820, at *1 (N.D. Ohio Aug. 23, 2006).

It is Gay's burden to show that this is "one of those extraordinary cases where a credible claim of actual innocence has been established by new evidence." McSwain, 2008 WL 2744640, at *9. To support his claim of equitable tolling, Gay must present "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup, 513 U.S. at 324; Souter, 395 F.3d at 590. Although these examples were not meant to be an exhaustive list, Souter, 395 F.3d at 593 n.8, the Supreme Court has emphasized that "the *Schlup* standard is demanding and permits review only in the 'extraordinary' case." House v. Bell, 547 U.S. 518, 538 (2006) (citing Schlup, 513 U.S. at 327); see also McQuiggin, 133 S. Ct. at 1928; Connolly, 2008 WL 5378012, at *4. "[T]o demonstrate the actual innocence that

would allow a court to consider a time-barred constitutional claim, a habeas petitioner must present 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]'" *Connolly*, 2008 WL 5378012, at *4 (quoting *Schlup*, 513 U.S. at 316).

Although Gay contends that he should benefit from equitable tolling due to his "actual innocence," the argument in his Traverse is primarily focused on the alleged ineffective assistance of his counsel. *See generally* R. 10, PageID #: 375-384. His theory as to his actual innocence is raised in that context:

> . . . the purported victim[3] had been arrested with a gun immediately following the purported victim's initial threat to Petitioner's mother which involved a gun and had just been released on bond concerning that matter[4] when the alleged victim, again, threatened Petitioner's mother. Clearly, Petitioner's knowledge of these facts would have established the fact that Petitioner had a reasonable expectation of eminent physical harm occurring to either himself or his mother, or both, when the purported victim reached behind his back during the random encounter.

(R. 10, at PageID #: 375.) After an extended discussion centering on the ineffectiveness of counsel, Gay returned to the issue of actual innocence as follows:

---

[3] Although Gay refers to Coleman as the "purported victim" and the "alleged victim," there is no dispute that Gay shot and killed Coleman; rather, the issue at trial was Gay's theory of self-defense.

[4] Gay had asserted that, in the weeks previous to the September 11, 2011, incident, the victim Coleman had earlier threatened his mother, and had been jailed for possession of a gun. *See, e.g.*, R. 6, RX 7, PageID #: 85, 89. There is no indication, on this record, that Coleman's arrest was related to the encounter with Gay's mother. Nor is there any evidence that Coleman had a gun or other weapon when he was fatally shot by Gay.

> With respect, had the jury known that Petitioner was aware that the alleged victim had just been released from jail on a gun charge, then any reasonable juror would have found that the Petitioner had a reasonable belief of impending serious harm to either himself or his mother at the time of the incident in question. At the very least, this evidence would have raised sufficient doubt concerning Petitioner's guilt.

(R. 10, at PageID #: 375.)

In the Return of Writ, the respondent contends that Gay has failed to set forth a viable claim of actual innocence to warrant equitable tolling. The respondent points out that the claims of the petition itself merely allege ineffectiveness of counsel. (R. 6, PageID #: 51.) Gay does not raise "actual innocence" as a free-standing claim, but rather as an argument to support equitable tolling.

The critical issue, however, is whether "new facts" raise sufficient doubt about Gay's guilt to undermine confidence in his conviction. Souter, 395 F.3d at 590 (quoting Schlup, 513 U.S. at 317). The court of appeals, in deciding Gay's manifest weight of the evidence claim, extensively addressed the evidence concerning his affirmative defense, indicating:

> Mr. Gay does not dispute shooting Mr. Coleman. He maintains that he shot him in self-defense and defense of his mother.

(R. 6, RX 10, PageID #: 168; Gay, 2013 WL 5432856, at *2.)

> Mr. Gay focuses his argument on the second element of his self-defense/defense of others claim (i.e. "that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was in the use of force.") "When determining if the second element of self-defense has been proven * * *, the jury must consider all the circumstances to see whether the defendant had an

> objective reasonable belief of imminent danger and if he possessed a subjective honest belief that he was in danger of imminent harm."

(R. 6, RX 10, PageID #: 169; *Gay*, 2013 WL 5432856, at *2 (case citations omitted).)

There was testimony that Coleman arrived at Ms. White's [the mother's] house, where Gay was also present, and the following events ensued:

> Ms. White testified that Mr. Coleman then pounded on the door. When she opened it, he allegedly threatened her and called her names. According to Ms. White, Mr. Coleman said, "bitch, I'm going to kill you" and "reached like he was about to go up under his shirt for something." Ms. Zanders testified that she was standing in the living room and could hear Mr. Coleman speaking with Ms. White. She further testified that Mr. Coleman asked Ms. White if she had his dog, which Ms. White denied. Ms. White testified that she did not hear Mr. Coleman asking about his dog because he was "babbling on" and "so crazy." Ms. White then slammed the door shut.
>
> Mr. Gay woke up when he heard people yelling and the door slam. Ms. White testified that she told Mr. Gay that "someone was just at [her] door threatening [her] life." Ms. White could not recall if she told Mr. Gay that she thought Mr. Coleman had a gun. She asked Ms. Zanders to drive her to see a friend, Izzy Edwards, who owned a t-shirt shop at Kelly's Drive Thru. Mr. Edwards and Mr. Coleman were friends who grew up together. Mr. Coleman lived on the first floor of a building owned by Mr. Edwards. Ms. White wanted to tell Mr. Edwards about "the man who threatened [her] life" to find out his real name so that she could call the police. Ms. White said she was "terrified" after the encounter with Mr. Coleman. Mr. Gay went with Ms. Zanders and his mother to see Mr. Edwards. He took a gun with him to Kelly's Drive Thru as he "was going up there with two females and [he] wanted to protect them if [he] had to." He described the neighborhood as "terrible," full of crime including murder, violence and guns, and where the people are "just out of control."
>
> Surveillance video of the scene showed that Ms. White entered the store and exited a short time later. She jogged back to Ms. Zander's car with Mr. Edwards following behind her. Ms. White claims she ran back to the car because she was scared due to the incident with Mr. Coleman. Mr. Gay and Ms. Zanders remained in the car while Ms. White and Mr. Edwards talked outside the driver's side front window

of the car.  Ms. White testified that she told Mr. Edwards that Mr. Coleman "had threatened her life again, for the second time, and [she] wanted his name so [she could] call the police." As Ms. White and Mr. Edwards conversed, Mr. Coleman and another individual walked across the street and approached the car.

As Mr. Coleman approached, Ms. White testified that she moved toward the rear of the car because she was afraid of Mr. Coleman.  At this point, Mr. Gay exited the front passenger side of the car with a gun in his hand.  Mr. Gay described Mr. Coleman as having a "look on his face, had his hand in his pocket, he kind of made me feel like he was going to attack my mother or something like that."  He had the gun out because he was unsure if Mr. Coleman was holding onto a gun in his pocket and because his mother looked scared.  Mr. Gay put the gun back in his pocket when he saw that Mr. Coleman did not have a gun in his hand.

An argument ensued between Ms. White and Mr. Coleman over the whereabouts of his dog.  Ms. White testified that she feared Mr. Coleman throughout the whole exchange, although video of the altercation demonstrated that she was within arms-length of him during the incident.  The video reflected that during the argument, when Mr. Coleman stepped up close to Mr. Gay, Mr. Gay put his arm out in front of him to keep Mr. Coleman away from him.  Mr. Gay testified that he tried to persuade Mr. Coleman and his mother to calm down.

The argument continued to escalate when according to Mr. Gay, Mr. Coleman then allegedly stated, "that bitch, I fuck her up."  Ms. White testified that Mr. Coleman said, "bitch, I am going to kill you and fuck * * * you up" and that "it ain't over."  Mr. Edwards then pushed Mr. Coleman away from Ms. White.  Mr. Gay testified that Mr. Coleman kept reaching around his belt area and then behind his back, which he "automatically assumed [meant] he was reaching for a gun."  Mr. Gay told Mr. Coleman to leave, and Ms. White testified that Mr. Coleman made a reaching movement around his pockets and the edge of his shirt.  She was not sure if she saw Mr. Coleman flash a gun.  Mr. Edwards testified that Mr. Coleman did not say anything to Mr. Gay to threaten him.

Mr. Gay testified that he thought that Mr. Coleman was going to shoot him and Ms. White.  The reason Mr. Gay shot Mr. Coleman, according to Mr. Gay, was because he reached behind his back and threatened

Ms. White more than once. There was no evidence produced during trial that Mr. Coleman had a gun or any other weapon on his person at the time of the shooting. Toxicology tests conducted on Mr. Coleman after the shooting established that his blood alcohol level was .275, thus indicating he was very intoxicated.

Video surveillance of the scene with multiple camera angles was shown during the trial. The videos were not equipped with sound so as to confirm what was said, when or by whom. Due to the angle and distance, it is unclear whether Mr. Coleman was making any type of reaching movement just before he was shot.

On the day of the shooting, Detective David Garro transported Mr. Edwards to the station to be interviewed and recorded the conversation with him in the car. Mr. Edwards stated that he heard Mr. Coleman say during the altercation that "[t]his isn't over" or "this is far from over." He described Mr. Coleman as "antsy" right before the shooting. Mr. Edwards was shown a photo array, which included a picture of Mr. Gay. At that time, he did not identify anyone from the array as the person who shot Mr. Coleman.

Mr. Edwards was interviewed a second time the day after the shooting by Detective Garro and another detective. This time, he identified Mr. Gay as the shooter. He said he did not want to identify him the day before because he was scared. He again stated that Mr. Coleman was "antsy" on the day of the shooting. Mr. Edwards also told the detectives that there was a confrontation between Mr. Coleman and Ms. White about one month before the shooting. He further stated that when Ms. White came to speak with him at Kelly's Drive Thru on the day of the shooting, she told him about that day's earlier incident on her porch involving Mr. Coleman. According to Mr. Edwards, Ms. White described Mr. Coleman as antsy and stated that he reached behind his back during the incident on her porch.

At trial, Mr. Edwards did not recall telling Detective Garro about the confrontation between Ms. White and Mr. Coleman that allegedly occurred one month prior to the shooting. He also did not recall saying that Ms. White told him Mr. Coleman was antsy and reached behind his back when he came to her house right before the shooting.

Ms. Zanders was also interviewed by the Akron Police after the shooting. According to the detective who interviewed her, Ms. Zanders stated she heard Ms. White tell Mr. Edwards that Mr. Coleman was

threatening her. Ms. Zanders was able to relay information about what was said during the altercation at Kelly's Drive Thru because the passenger side door was open when Mr. Gay exited the car and her driver's side window was cracked.

At trial, however, Ms. Zanders could not recall if she heard Ms. White tell Mr. Edwards that Mr. Coleman threatened her. This was despite the fact that surveillance video of the scene showed that Mr. Edwards was bent over and leaning into her car window while he was speaking to Ms. White. She also testified that she could not hear the argument that ensued between Ms. White and Mr. Coleman outside her car as her window was rolled up. The video, however, demonstrated that her window was not rolled up.

There is conflicting testimony about what both Mr. Coleman and Ms. White said and did during their confrontation. There is also a conflict in the testimony regarding whether Ms. White told Mr. Edwards that Mr. Coleman threatened her earlier that day. While Ms. White and Mr. Gay contend Mr. Coleman reached as if for a gun, Mr. Edwards maintains that Mr. Coleman did not appear to him to be reaching for a gun. The incident itself was captured on surveillance video, but it is unclear from the camera angles whether Mr. Coleman made a reaching movement.

"[A] jury is free to believe or reject the testimony of each witness, and issues of credibility are primarily reserved for the trier of fact." State v. Miles, 9th Dist. Summit No. 26187, 2012–Ohio–2607, ¶ 24, quoting State v. Rice, 9th Dist. Summit No. 26116, 2012–Ohio–2174, ¶ 35. "A conviction is not against the manifest weight because the jury chose to credit the State's version of the events." State v. Minor, 9th Dist. Summit No. 26362, 2013–Ohio–558, ¶ 28, quoting State v. Breneman, 9th Dist. Wayne No. 11CA0039, 2012–Ohio–3632, ¶ 9. Further, this Court notes that the jury not only had witness testimony to consider when reaching its decision, but also the jury had the video of the incident to help it resolve any issues of credibility or inconsistencies in the witness' testimony. Based on a careful review of the record, this Court cannot conclude that the jury lost its way in rejecting Mr. Gay's affirmative defenses. Accordingly, Mr. Gay's conviction is not against the manifest weight of the evidence.

(R. 6, RX 10, PageID #: 170-174; Gay, 2013 WL 5432856, at *3-*5.)

Gay's argument is that, had the jury known that Gay knew that Coleman had just been in jail on a gun charge, "then any reasonable juror would have found that the Petitioner had a reasonable belief of impending serious harm to either himself or his mother at the time of the incident in question. At the very least, this evidence would have raised sufficient doubt concerning Petitioner's guilt." (R. 10, at PageID #: 375.) The court does not consider this to be evidence of innocence so strong that the court cannot have confidence in the outcome of the jury trial.

A review of the trial evidence as recited by the state court of appeals demonstrates that Gay was able to present ample testimony supporting his self-defense theory. Gay had been personally present when Coleman angrily confronted his mother, threatening her, both at her house (R. 6, RX 10, PageID #: 170, ¶13; Gay, 2013 WL 5432856, at *3), and later at Edwards' shop (R. 6, RX 10, PageID #: 171-172, ¶17; Gay, 2013 WL 5432856, at *4). Gay testified that he had a concern that Coleman might have a gun (R. 6, RX 10, PageID #: 171-172, ¶17; Gay, 2013 WL 5432856, at *4), and Gay shot him because he feared that Coleman might be reaching for a gun under his clothing (R. 6, RX 10, PageID #: 171-172, ¶¶17-18; Gay, 2013 WL 5432856, at *4). In other words, there was testimony that the jury could have credited, had it so chosen, toward a finding of a reasonable belief of impending serious harm.

On the other hand, Gay testified that Coleman did not have a gun in his hand (R. 6, RX 10, PageID #: 171, ¶15; Gay, 2013 WL 5432856, at *4), there was no evidence that Coleman had a gun or any weapon (R. 6, RX 10, PageID #: 172, ¶18;

*Gay*, 2013 WL 5432856, at *4), and Edwards testified that he did not believe that Coleman was reaching for a gun (R. 6, RX 10, PageID #: 174, ¶25; *Gay*, 2013 WL 5432856, at *5). The jury also had the benefit of the video footage (R. 6, RX 10, PageID #: 172, ¶19; *Gay*, 2013 WL 5432856, at *4). The state court of appeals found the issues of credibility and inconsistent testimony were properly a matter for the jury, and that the jury's conviction was not against the weight of the evidence. Additional evidence that Gay may have had a belief of impending serious harm, and thus may have believed lethal self-defense was necessary, does not make it more likely, than not, that a jury would find this belief to be objectively reasonable. *See, e.g.*, *Guy v. Butler*, No. 14C08581, 2015 WL 6165147, at *7 (N.D. Ill. Oct. 19, 2015) ("new" evidence was "purely cumulative").

Gay has not met his burden to show that this is "one of those extraordinary cases where a credible claim of actual innocence has been established by new evidence." *McSwain*, 2008 WL 2744640, at *9. The court finds that Gay has failed to carry his burden to establish that equitable tolling should apply.

The motion to dismiss (R. 6) should be granted, and the petition should be dismissed as untimely filed.

RECOMMENDATION

The motion to dismiss (R. 6) the petition for a writ of habeas corpus should be granted.

Dated:  February 13, 2017    /s/ David A. Ruiz
                             David A. Ruiz
                             United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).